In re Frank NICSINGER and Marlene Nicsinger, Debtors.

MERCANTILE BANK OF JOPLIN N.A., Plaintiff,

v.

Frank NICSINGER, Defendant.

Bankruptcy No. 90–30305.
Adv. No. 91–3003.

United States District Court,
W.D. Missouri,
Southwestern Division.

Jan. 27, 1992.

Thomas Noland, Joplin, Mo., for plaintiff.

David Schroeder, Fitzsimmons, Shroeder & Nelson, Springfield, Mo., for defendant, debtors.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

The matter before the Court is the Complaint of Plaintiff Mercantile Bank of Joplin N.A. ("the Bank"), seeking to have the discharge of Debtor Frank Nicsinger ("Debtor") denied pursuant to 11 U.S.C. § 727(a)(7). The Bank also seeks to have certain debts declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). These debts arise out of Debtor's personal guaranty of certain obligations of a corporation of which he was President. In addition, the Bank seeks to have judgment entered on Debtor's personal guaranty. In response, Debtor denies the allegations of the Bank's Complaint, and also contends that the Bank's claim on his guaranty should be disallowed because of the Bank's alleged failure to comply with the Uniform Commercial Code in the foreclosure and sale of collateral. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (I) & (J). For the reasons set forth below, I find that Debtor's discharge should be denied, that certain of Debtor's debts are nondischargeable, and further that the Bank is entitled to assert a deficiency claim against Debtor.

## FACTUAL BACKGROUND

### A. *Bank's Contentions*

This personal bankruptcy was filed on August 10, 1990. Debtor Frank Nicsinger is an individual who was formerly President, Director, and chief executive officer of the Nicsinger Uniform Company, Inc. ("NUCI"). On November 14, 1989, NUCI filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. Thereafter, NUCI and the Bank entered into a cash collateral agreement in which NUCI acknowledged that its outstanding

indebtedness to the Bank at the time of the filing of NUCI's bankruptcy petition was in the approximate amount of $974,550.00. The parties also stipulated that the Bank was the holder of a continuing, perfected, first priority security interest in substantially all of NUCI's property to secure its indebtedness, including NUCI's accounts receivable and after-acquired accounts. The NUCI Chapter 11 failed, and the company was liquidated.

All sums owed to the Bank by NUCI were personally guarantied by Frank Nicsinger, the debtor herein. After giving credit for the property that has been liquidated, and the receivables collected for the benefit of the Bank, the balance due the Bank is $662,211.79. The Bank reasonably anticipates that it will recover a maximum of $56,000 from the remaining accounts receivable. Thus, the Bank asks for judgment on the personal guaranty in the amount of $606,211.79.

In support of its contention that Debtor's discharge should be denied, or the debts to it found nondischargeable, the Bank relies on three separate actions or series of events involving Debtor in his role as President of NUCI. First, on November 10, 1989, just four days prior to the filing of NUCI's petition, Frank Nicsinger caused NUCI to assign payment of an account receivable, from Florida State University ("the Florida State Receivable") in the amount of $39,944.00, to Joe Lance of Plant City, Florida. The evidence shows that at the time of the assignment, Debtor knew that NUCI was preparing to file its bankruptcy petition, and was also aware that the Florida State Receivable constituted part of the Bank's collateral. The assignment was made without the knowledge or consent of the Bank. The Bank first became aware of the assignment on August 28, 1990 when, upon contacting Florida State University in an attempt to collect the receivable, it was disclosed that payment had already been made pursuant to the direction of Frank Nicsinger contained in a letter dated November 10, 1989.

In a meeting with Bank officials on November 16, 1989, Debtor failed to disclose the assignment of the Florida State Receivable and, knowing that the Bank was relying on the Florida State Receivable when it entered into the cash collateral agreement, represented to Bank officials that the receivable remained valid and collectible and constituted good collateral upon which the Bank should continue to rely in advancing working capital to NUCI.

On at least one other occasion, during an April, 1990 meeting with Bank officials, Debtor failed to disclose the assignment of the Florida State Receivable, even though he was given an opportunity to do so when Bank officials sought assurances that payment would be forthcoming on account of the Florida State Receivable. Debtor took specific steps to provide the Bank with some comfort that the Florida State Receivable would be paid, but failed to inform the Bank that the account had been assigned and that payment would not be made for the Bank's benefit.

The second event took place on May 2, 1990. Henry Nicsinger, one of Frank Nicsinger's sons, as Vice–President of NUCI, assigned payment of an account receivable from Lake Central High School, St. John, Indiana ("the Lake Central Receivable") in the amount of $21,738.90, to Pat Butler of Terre Haute, Indiana. The Lake Central Receivable constituted collateral of the Bank, and its assignment was made without the knowledge or consent of the Bank. The Bank first became aware of the assignment on July 26, 1990 when, upon contacting Lake Central High School in an attempt to collect the receivable, it was disclosed that payment had already been made pursuant to the direction of Henry Nicsinger contained in a letter dated May 2, 1990.

The third basis for the Bank's complaint relates to NUCI's practice of pre-invoicing shipments to obtain additional financing under the cash collateral agreement. Subsequent to the filing of NUCI's Chapter 11 petition, Steve Nicsinger, also a son of Frank Nicsinger, as Vice–President of NUCI, presented shipping invoices to the Bank pursuant to the cash collateral agreement between the Bank and NUCI. Upon receipt of these invoices the Bank, in ac-

cordance with the terms of the cash collateral agreement, advanced on a revolving draw note eighty-five percent of new invoices for completed, shipped orders.

During their April 16, 1990 monthly inspection of NUCI's facilities, Bank representatives discovered that certain orders were unfinished and unshipped. Invoices previously presented to the Bank had represented that these orders had already been completed and shipped. Essentially, NUCI had engaged in a practice of "pre-invoicing" orders so as to obtain advances under the revolver prior to actual shipment of the merchandise, resulting in NUCI's being out of trust under the cash collateral agreement. When asked about this, Frank Nicsinger acknowledged that it was wrong, apologized, and vowed to never let it occur again.

In May, 1990, Bank officials became suspicious of NUCI's operations and, pursuant to an agreement between Debtor, as President of NUCI, and Bank officials, NUCI was closed to allow the Bank to conduct an inspection of NUCI's facilities to determine if it was in the Bank's best interest to provide additional funding to complete certain work orders and work in progress. During the inspection, which was conducted in early June, 1990, the Bank discovered that NUCI was again out of trust under the cash collateral agreement. Frank Nicsinger, at that time, admitted that NUCI was out of trust and had pre-invoiced orders worth more than $100,000.00. He stated that he had been aware of this for some time. By mutual agreement, NUCI's factory was reopened, and the Bank spent approximately $75,000.00 to complete the unfinished orders and make the receivables valid and collectible.

### B. *Debtor's Contentions*

In addition to disputing the Bank's discharge and dischargeability contentions, Debtor contends that the Bank did not comply with the Uniform Commercial Code in foreclosing upon and selling its collateral, and that it therefore should be denied any deficiency claim against him as guarantor. Mo.Rev.Stat. § 400.9–505(2) (Supp.1990).

NUCI's factory was closed on June 15, 1990, and possession of the facility was relinquished to the Bank. The Bank conducted a public foreclosure sale of the factory real estate on August 15, 1990, at which the Bank placed the highest bid of $180,000.00. In conjunction with the notice of the foreclosure sale, the Bank, on July 25, 1990, notified Debtor and NUCI by letter that it intended to sell the personal property that secured NUCI's indebtedness to the Bank at one or more private sales on, or after August 15, 1990.

Subsequent to the August 15, 1990 real estate foreclosure sale, the Bank continued its negotiations with Shaffer Sportswear Manufacturing, Inc. ("Shaffer"), a prospective buyer that desired to purchase the real estate from the Bank together with a majority of the machinery, equipment, and inventory. Primarily because of these negotiations, and the withdrawal of a competing bid, the Bank apparently made no other attempt to sell the personal property.

In December, 1990, the Bank entered into an Asset Purchase Agreement with Shaffer, which provided that Shaffer would purchase certain personal property consisting basically of inventory, equipment, and fixtures. On April 22, 1991, a closing was held, and the Asset Purchase Agreement was consummated between the Bank and Shaffer. Debtor testified that he was not informed of the sale, nor of the items of personal property sold.

Since it took possession of NUCI's facilities and personal property, the Bank has continuously attempted to collect the outstanding accounts receivable that were generated by NUCI's operations, some of which appear to be subject to various offsetting claims and defenses.

### LEGAL ANALYSIS

At the conclusion of the trial, pursuant to Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52, I announced my oral findings of facts and conclusions of law as to the discharge and dischargeability portions of the dispute. Those findings of fact and conclusions of law are incorporated herein and supplemented in accordance with this Memorandum Opinion. In addition, I provided

the parties the opportunity to brief the Uniform Commercial Code issues.

### A. Dischargeability Under Section 523(a)(2)(A)

 To establish fraud under section 523(a)(2)(A), the following five elements must be proved:

(1) that the debtor made representations;

(2) that at the time the representations were made the debtor knew them to be false;

(3) that the debtor made the representations with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on the representations;[1] and

(5) that the creditor sustained the alleged injury as a proximate result of the representations.

*In re Ophaug,* 827 F.2d 340, 342 n. 1 (8th Cir.1987).

### (1) The Florida State Receivable

On at least two separate occasions the Florida State Receivable was discussed, in which Debtor could have advised the Bank that it had been assigned, but failed to do so. Throughout NUCI's Chapter 11 operations, Debtor continued to represent to the Bank that the Florida State Receivable remained valid and collectible collateral upon which the Bank should continue to rely in advancing working capital to NUCI. Debtor was clearly aware that his representations were false. Furthermore, Debtor made these misrepresentations because he knew that if the Bank became aware of the assignment, it would take the account off the accounts receivable base and cease advancing moneys against it. Thus, the first three elements of section 523(a)(2)(A) are satisfied with respect to the assignment of the Florida State Receivable.

The Bank relied on the existence of the Florida State Receivable in at least two ways. The first was in its consideration of whether the Bank would enter into a cash collateral agreement with NUCI after its Chapter 11 filing. Second, the Bank continued to credit the Florida State Receivable to the accounts receivable base against which it advanced funds to NUCI under the cash collateral agreement. If the Bank had been aware of the assignment of the Florida State Receivable, it would have been taken out of the accounts receivable base. The evidence shows that, as a result of Debtor's actions, the Bank's loss on the loan was increased by $26,702.80. Thus, not only was there reliance on the Bank's part, but the $26,702.80 in damages sustained were a direct and proximate result of Debtor's misrepresentations.

Accordingly, I find that, to the extent of $26,702.80, the Bank's claim against Debtor is not dischargeable pursuant to section 523(a)(2)(A).

### (2) The Lake Central Receivable

 The second matter upon which the Bank's claim is based concerns Henry Nicsinger's assignment of the Lake Central Receivable, as a result of which the Bank allegedly suffered a loss of $5,539.00. Although the evidence surrounding the assignment of this account appears to be confused, I find that Debtor was not aware of the assignment until Bank officials so advised him. Thus, if any misrepresentations were made by Debtor, they were not made knowingly. Thus, I find that the assignment of the Lake Central Receivable does not create a separate basis for nondischargeability under section 523(a)(2)(A).

### (3) The Pre–Invoicing

 The third basis for the Bank's dischargeability complaint relates to the representations contained in the falsified invoices which were presented to the Bank. Although the evidence appears to indicate that Debtor was not aware of the pre-invoicing practice when it began, I find that he did become aware of it prior to the April 16, 1990 meeting with Bank officials. At that meeting, he admitted to Bank officials that he was aware that the invoices had

---

**1.** The Eighth Circuit has concluded that section 523(a)(2)(A) does not require a creditor to prove that its reliance on the debtor's fraudulent misrepresentations was reasonable. *In re Ophaug,* 827 F.2d 340, 342–43 (8th Cir.1987).

been presented to the Bank before the goods had been shipped, in violation of the cash collateral agreement.

■ A debtor's silence regarding material facts can constitute a false representation under section 523(a)(2)(A). *In re Van Horne*, 823 F.2d 1285, 1288 (8th Cir.1987). A borrower has the duty to divulge all material facts to a lender. *Van Horne*, 823 F.2d at 1288. In this case, substantial omissions occurred when Debtor failed to apprise the Bank that the pre-invoicing had taken place. Certainly, this was a fact that was material to the relationship between Debtor and the Bank, particularly in light of the cash collateral agreement. There is also evidence which supports the conclusion that at least some of the pre-invoicing took place with Debtor's knowledge and apparent approval. Accordingly, I find that Debtor knowingly made false representations to the Bank in these regards. I further find that Debtor made these misrepresentations with the intent and purpose of deceiving the Bank, because he knew that the Bank would not advance moneys unless the invoices were presented. Therefore, the first three elements of section 523(a)(2)(A) have been satisfied.

The Bank relied upon the fraudulent invoices when it made advances against them in accordance with the cash collateral agreement. The Bank suffered damages in the amount of $33,445.65 as a direct and proximate result of Debtor's fraudulent behavior surrounding the pre-invoicing practices. Therefore, I find that the Bank's claim against Debtor Frank Nicsinger is not dischargeable pursuant to section 523(a)(2)(A) to the extent of $33,445.65.

The fourth basis for the Bank's claim also relates to the pre-invoicing. The Bank alleges that it made additional overadvances in the amount of $30,380.31 as a result of the fraudulent invoices. But these additional overadvances, including advances made over the credit line, were made after the Bank had become aware of the pre-invoicing practices. I find that the evidence shows a lack of reliance on the Bank's part with respect to these overadvances. Therefore, that portion of the Bank's claim against Debtor does not fall within section 523(a)(2)(A).

In summary, I find that of the amount due the Bank, the sums of $33,445.65 and $26,702.80, or a total of $60,148.45, are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). It should be noted that since I also will deny Mr. Nicsinger's discharge *in toto*, the Bank can enforce the entire obligation of Mr. Nicsinger notwithstanding the filing of this Chapter 7 case.

### B. *Discharge Under Section 727*

■ Section 727(a)(7) provides that the Court shall grant the debtor a discharge, unless—

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of [section 727(a)], on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under [title 11] or under the Bankruptcy Act, concerning an insider.

11 U.S.C. § 727(a)(7).

Since Debtor was President, Director, and person in control of NUCI, NUCI was an insider of Debtor Frank Nicsinger under 11 U.S.C. § 101(31)(A)(iv). Therefore, if on or within one year prior to the filing of the bankruptcy petition, Debtor committed any act specified in paragraph (2), (3), (4), (5), or (6) of section 727(a) in connection with NUCI's bankruptcy case, Debtor's discharge is to be denied.

Section 727(a)(2) provides that a debtor's discharge should be denied where:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [title 11], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

Based on my prior findings with respect to the Florida State Receivable, I find that the account was property of NUCI, and was transferred within one year prior to the filing of the bankruptcy petition. The transfer was made by Debtor, on behalf of NUCI, with the intent to hinder, delay or defraud the Bank. Thus, Debtor has, on or within one year before the date of the filing of the petition, committed an act specified in section 727(a)(2) in connection with an insider's bankruptcy case. Debtor Frank Nicsinger's discharge should therefore be denied pursuant to section 727(a)(7).

■ Section 727(a)(3) provides an additional ground for denial of Debtor's discharge. Section 727(a)(3) provides that a debtor should be denied a discharge where:

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

Section 727(a)(3) is an important section, because when a debtor files a Chapter 11 petition, it is given the power to continue to operate. The court relies upon the debtor to provide correct and truthful information to it and to creditors. Congress determined that a debtor who falsifies information in connection with a bankruptcy case should be denied a discharge.

The evidence in this case shows that Debtor participated in a series of transactions through which the Bank was presented with recorded information indicating that goods and merchandise had been shipped by NUCI when those goods and merchandise had in fact not been shipped. Although he may not have been aware of that pattern or practice at the outset, Debtor became aware of it and should have, upon becoming aware of it, notified the Bank. His failure to do so constitutes his adopting and joining in that practice of failing to keep and falsifying recorded information upon which the Bank relied in ascertaining NUCI's financial condition or business transactions. The evidence and circumstances of this case fail to provide any justification for Debtor's actions. Thus, Debtor has, on or within one year before the date of the filing of the petition, committed an act specified in section 727(a)(3) in connection with an insider's bankruptcy case. Therefore, Debtor Frank Nicsinger's discharge should be denied pursuant to section 727(a)(7).

## C. *Disallowance of the Bank's Claims*

The remaining issue to be considered is whether the Bank should be allowed to assert its deficiency claim against Debtor Frank Nicsinger based on his personal guaranty of NUCI's debt to the Bank. The evidence shows a deficiency claim of $606,211.79.

Debtor contends that the Bank should not be entitled to assert any such deficiency claim against him because of its alleged failure to comply with the Notice and Sale Provisions of the Missouri Uniform Commercial Code (the "U.C.C."). He also contends that the Bank has impliedly elected its option of strict foreclosure under U.C.C. § 9–505(2), thereby precluding the Bank from claiming any deficiency on the guaranty.

Section 9–504(3) of the U.C.C. governs a creditor's disposition of collateral upon default and repossession and provides, in relevant part, as follows:

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.... [R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition

is to be made shall be sent by the secured party to the debtor.

Mo.Rev.Stat. § 400.9–504(3) (Supp.1990).

A secured party is required to give to the debtor reasonable notice of the sale in order to preserve its right to a deficiency judgment. *Chrysler Capital Corp. v. Cotlar*, 762 S.W.2d 859, 861 (Mo.Ct.App.1989). For purposes of U.C.C. § 9–504(3), a guarantor, such as Frank Nicsinger in this case, is a debtor entitled to such reasonable notice. *Cherry Manor v. American Health Care*, 797 S.W.2d 817, 821 (Mo.Ct.App. 1990).

On July 25, 1990, the Bank notified Debtor and NUCI by letter that it intended to sell, at one or more private sales on or after August 15, 1990, the following collateral:

> All machinery and equipment, furniture, fixtures, and inventory, now held, purchased with loan proceeds of [sic] hereafter acquired, and all additions and accessions thereto, and all present and future accounts receivable, proceeds arising therefrom, chattel paper, contract rights, and general intangibles, however evidenced or acquired, and the products and proceeds thereof, together with all books and records relating to all of the above.

■ Debtor does not dispute that this notice complied with the requirements of U.C.C. § 9–504(3) with regard to the inventory, equipment, and fixtures that were sold to Shaffer. He does, however, contend that, given the notice sent, the Bank's failure to dispose of certain accounts receivable, chattel paper, contract rights, and other general intangibles was commercially unreasonable.

The evidence presented at trial indicates that the Bank attempted unsuccessfully to market NUCI as a going concern. As a result, the Bank continued its negotiations with Shaffer, and sold all or substantially all of NUCI's personal property. NUCI's remaining accounts receivable were retained by the Bank, and since taking possession of them, the Bank has made a good faith effort to collect the monies owed on these accounts. Based upon the evidence, I

find that the Bank's disposition of the collateral in question has been commercially reasonable pursuant to U.C.C. § 9–504(3). Therefore, U.C.C. § 9–504(3) does not preclude the Bank from asserting its deficiency claim against Debtor Frank Nicsinger.

■ Debtor next argues that the Bank's continued retention of the remaining NUCI accounts receivable constitutes an implied election under U.C.C. § 9–505(2) to accept the collateral in full satisfaction of the debts owed by NUCI, thereby extinguishing the Bank's deficiency claim against Debtor. Section 9–505(2), which recognizes a secured creditor's right in certain cases to forego its right to any deficiency and elect strict foreclosure on its collateral, provides, in relevant part, as follows:

> (2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor. . . .

Mo.Rev.Stat. § 400.9–505(2) (Supp.1990).

Missouri Courts have not resolved the issue of whether written notice of a secured creditor's strict foreclosure election is required in every case before the creditor may validly retain the collateral. Three approaches to the problem have been identified by one Missouri court:

> Under the first approach "[a]n election to take the collateral in full satisfaction [of the debt] will not be implied; it must be made by written notice to the Debtor." . . . The second approach holds that an election to retain can be implied from an unreasonably prolonged retention of the collateral by the secured party. Under this view, the determination of what constitutes an unreasonable period of time is a question for the trier of fact. . . . The third approach requires proof of a manifest intent by the secured party to accept the collateral in satisfaction of the obligation. Seemingly, this intent cannot be inferred from the unreasonable retention of the collateral alone.

*Graff v. North Port Dev. Co.*, 734 S.W.2d 221, 228 (Mo.Ct.App.1987) (citations omitted).

The court in *Graff* determined that under the circumstances of that case it was not required to decide which of the three approaches to adopt. *Id.* at 229. Likewise, I am not required to determine which approach the Missouri Courts would most likely adopt, because I find that the Bank has not elected strict foreclosure under any of the three approaches.

Debtor does not dispute that notice was never given to the effect that the Bank was electing or intending to elect strict foreclosure. Therefore, the Bank did not elect to retain the collateral in full satisfaction of the debt under the first approach.

In order to find an implied election of strict foreclosure under the second approach, the court must determine that the creditor retained the collateral for an unreasonable amount of time. In cases where strict foreclosure has been implied under this approach, the creditor often has retained the collateral for more than a year and either allowed the collateral to remain idle, resulting in a diminished net return on its liquidation, or used the collateral for its own personal gain during the period of retention. *See, e.g., In re Boyd*, 73 B.R. 122 (Bankr.N.D.Tex.1987) (retention and use resulting in undue delay of foreclosure sale supported implied acceptance of collateral in full satisfaction of debt); *Schmode's, Inc. v. Wilkinson*, 219 Neb. 209, 361 N.W.2d 557 (1985) (creditor's use of vehicle for nearly 3 years and 204,000 miles constitutes implied election to strictly foreclose). In fact, it has been explained that the second approach rests on the notion that it would be unfair to the debtor to allow a secured creditor to retain possession of the collateral for an excessive period of time, use it extensively, or allow it to depreciate in value, and then profit by asserting a right to a deficiency based on its own failure to furnish the requisite notice. *Alamosa Nat'l Bank v. San Luis Valley Grain Growers, Inc.*, 756 P.2d 1022, 1026 (Colo.Ct.App.1988); *see also Graff,* 734 S.W.2d at 228.

Based upon my finding that the Bank has put forth a good faith effort to collect the remaining accounts receivable, it cannot be said that the Bank has used the accounts receivable extensively or allowed them to depreciate in value. The Bank has merely attempted to collect the amounts due. In addition, this adversary proceeding was filed after the personal property and the accounts receivable had been in the Bank's possession for only about six months, during which time the Bank made reasonable efforts to dispose of all the collateral. Thus, the Bank was not unduly dilatory in making its decision to pursue its rights against Debtor Frank Nicsinger. Accordingly, I find that the evidence does not support a finding that the Bank impliedly elected strict foreclosure under the second approach announced in *Graff.*

Under the third approach, there must be proof of a manifest intent by the secured party to accept the collateral in satisfaction of the obligation. As stated above, the Bank has made reasonable efforts to collect the accounts receivable in its possession. The evidence indicates that the Bank, at one time, solicited unsuccessfully the assistance of Frank Nicsinger in its collection efforts. Based upon the evidence, I find that the requisite manifest intent on the part of the Bank to accept the collateral in full satisfaction of the debt has not been established.

Based on the foregoing, I find that:

1. Judgment should be entered in favor of Plaintiff and against Debtor Frank Nicsinger in the amount of $606,211.79; and

2. Pursuant to 11 U.S.C. § 523(a)(2)(A), such judgment is not dischargeable to the extent of $60,148.45; and

3. Notwithstanding the prior paragraph, Debtor Frank Nicsinger shall be denied a discharge pursuant to 11 U.S.C. § 727(a)(7).

A separate Order will be entered on this date in accordance with this Memorandum Opinion.